# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

WALTONIA WINCHESTER,      )
                                )
       Petitioner,           )
                                )
                                )
v.                                 )      C.A. No. N12M-12-004 BVM
                                )
STATE OF DELAWARE,        )
                                )
       Respondent.        )
                                )

Submitted: August 3, 2016
Decided: September 6, 2016

*Post-trial decision on Petitioner's Motion for Return of Property*

## COMMISSIONER'S REPORT AND RECOMMENDATION

Leroy A. Tice, Esquire, Law Offices of Leroy A. Tice, 23 NW Front St., Milford Delaware, 19963, Attorney for Petitioner.

Robert J. O'Neill, Jr., Esquire, Delaware Department of Justice, 820 North French Street, Wilmington, Delaware, 19801. Attorney for Respondent.

**MANNING, COMMISSIONER:**

Pursuant to Title 10 *Del. C.* § 512 and Superior Court Civil Rule 132(a)(4), the above captioned matter was assigned to the undersigned Commissioner for a Return of Property trial on July 28, 2016.[1] Upon consideration of the testimony and exhibits presented by both parties, I find the following facts have been established by a preponderance of the evidence and I recommend disposition as follows:

## Factual Background and Procedural History

In the spring of 2012, Delaware State Police ("DSP") received an anonymous tip regarding illegal drug sales occurring in the Fox Run shopping center, located in New Castle County, Delaware. DSP officers, in conjunction with the Governor's Task Force ("GTF") conducted covert surveillance and observed a suspect that fit the physical description and activities provided by the tipster. Based on this investigation, GTF identified one of the suspects as Shawn Tolson. Investigation revealed that Tolson was a member of the Thunderguards motorcycle gang and was selling cocaine in one or two ounce quantities. Investigation further revealed that Tolson worked for a man named Armor Lomack, who was the president of the Middletown chapter of the Thunderguards, and Tolson was the sergeant-at-arms.

---

[1] Prior to the trial, Petitioner waived her right to a jury trial and signed a consent form to proceed before a Commissioner of the Superior Court.

Once police obtained the phone number for Shawn Tolson they obtained a warrant for a wire-tap on August 17, 2012, and started researching the various people he was calling. Through the course of the investigation, police identified a subject named Ernest Saunders who was the vice-president of the Middletown chapter of the Thunderguards. Through a subsequent intercept of Ernest Saunders' calls, police identified Stanley Maddrey. Investigation revealed that Shawn Tolson was a street-level dealer and obtained his drugs from Ernest Saunders. Stanley Maddrey was an associate of Ernest Saunders, both of whom would "shop around" for the best price on a kilogram of cocaine before selling it to Tolson. At one point, Maddrey purchased three kilograms of cocaine for Saunders to sell to Tolson.

On September 27, 2012, police intercepted a conversation between Saunders and Maddrey. However, at that time, Maddrey's actual identity—specifically his name—was unknown to police. A few days prior, Saunders had agreed to pay $41,000.00 for "the whole thing," which police believed to be coded language for one kilogram of cocaine, from Maddrey. During this conversation, Maddrey advised that he would meet with his source and let Saunders know. Maddrey then contacted Saunders who arranged to meet after work at one of Saunders' addresses, 316 Paddington Drive. Police established surveillance and observed what they believed to be a delivery of cocaine between Maddrey and Saunders. During this

time, police observed a red 2006 Dodge Ram pickup truck (hereinafter also the "truck" or "Dodge Ram")[2] backed into the driveway at 16 Craig Road, Bear, Delaware—Maddrey's home address.

It was during this investigation that one of the police officers recognized Maddrey's voice from a prior investigation. Once police learned Maddrey's actual name, they also obtained a warrant for a wire-tap on his cellular telephone. The wire-tap went live on October 5, 2012. A check of Maddrey's criminal history revealed that he had previously pled guilty to delivery of cocaine in 1988 and to racketeering (for cocaine sales) in 2005.[3]

On October 12, 2012, police again intercepted calls between Maddrey and Saunders. Police observed Saunders drive to Maddrey's address at 16 Craig Road, where they both briefly met while sitting in the driveway in Saunders' vehicle. Based on their prior conversation, police believed that Maddrey delivered one kilogram of cocaine to Saunders during their brief meeting.

On October 15, 2012, Saunders called Maddrey to arrange another drug sale. Based on the intercepted conversation, police believed that Maddrey had about half a kilogram of cocaine for Saunders. Police established surveillance and observed Maddrey driving to Saunders' house in a red Dodge Ram pickup truck bearing

---

[2] State's Exhibit 5 (photo).

[3] Cr. A. No. 0308016208. It is also relevant to note that in connection with his guilty plea in the 2005 case, Maddrey agreed to forfeit a 1997 Dodge Dakota pickup truck. *See* State's Exhibit 1.

Delaware registration plate C495999. Police identified it as the same red Dodge Ram pickup truck previously parked at Maddrey's home address of 16 Craig Road. A check of the registration tag by police revealed that the truck was registered to the Petitioner, Waltonia Winchester.

On October 18, 2012, police intercepted a call between Maddrey and Saunders. During this call, Maddrey asked Saunders if he "wanted [him] to put one together," to which Saunders replied "yeah." Police knew from prior conversations that "one" referred to a kilogram of cocaine. Saunders and Maddrey made arrangements to meet and exchange the "one" for later that day. Police proceeded to establish surveillance on Maddrey and Saunders. That evening, two different members of the GTF observed Maddrey drive to the agreed upon meet location in the same red Dodge Ram pickup truck, bearing DE registration plate C495999. Police then observed Maddrey and Saunders meet in the parking lot of Christiana Hospital where police concluded the exchange occurred.

On October 20, 2012, police again intercepted calls between Maddrey and Saunders. During these calls, Saunders asked Maddrey to "hook him up," which was understood by police based on prior conversations to refer to a kilogram, or more, of cocaine. After a number of back-and-forth calls between Maddrey and Saunders, they agreed to meet in the Christiania Hospital parking lot that evening. Police established surveillance and observed Maddrey leave his residence at 8:25

p.m. and drive to the meet location in the same red Dodge Ram. Once in the hospital parking lot, Maddrey parked adjacent to Sauders' vehicle and then entered it. Police then observed Maddrey exit Saunders' vehicle, get back in the red Dodge Ram, and drive out of the parking lot and return home.

Additionally, Maddrey was observed by police operating the Dodge Ram on October 20, 2012, while attempting to make another drug sale for a kilogram of cocaine. This time, police observed him at the DMV on Hesler Boulvard.

On October 30, 2012, police again intercepted calls between Maddrey and Saunders. During these calls, Saunders told Maddrey to "hook him up." Police established surveillance and observed Saunders drive over to Maddrey's house at 16 Craig Road. Police observed Saunders arrive, enter and depart from Maddrey's residence in the span of approximately 12 minutes.

On November 5, 2012, police terminated the investigation and executed search warrants at various locations. At two residences connected to Saunders, police located over two kilograms of cocaine, a handgun, an assault rifle and over $29,000.00 in United Sates Currency ("USC"). At Maddrey's residence, 16 Craig Road, police located $26,206.00 USC, nine different cellular telephones and miscellaneous documents bearing Maddrey's name. An Ion scan of the USC recovered from Maddrey's residence tested positive for cocaine.[4]

---

[4] State's Exhibit 3.

Saunders and Maddrey were subsequently arrested and indicted with various criminal offenses in connection with the investigation. The Dodge Ram was seized by police from Maddrey's house on November 5, 2012. By certified letter, the State of Delaware, Department of Justice, notified Maddrey of its intent to file a petition in the Superior Court for forfeiture of the Dodge Ram pursuant to 16 *Del. C.* §4784.[5]

On December 5, 2012, Petitioner, Waltonia Winchester, as registered owner of the Dodge Ram, filed a Motion for Return of Property pursuant to Superior Court Civil Rule 71.3. In her motion, Petitioner asserted that: (1) she is the owner of the Dodge Ram and that on the day it was seized by police it was being permissibly operated by her friend, Stanley Maddrey; (2) it is her knowledge and belief that Maddrey had not been criminally charged in connection with the use of the vehicle, or any other offense; (3) she had no knowledge whatsoever of any alleged illegal act committed by Maddrey, and she certainly did not consent to same, pursuant to 16 *Del. C.* § 4784(a)(4)(b); (4) she had a lawfully possessory interest in the vehicle as she paid for same with proceeds from her social security income payments. 16 *Del C.* § 4784(j)(1); and (5) Delco Credit Union is a current lien holder with a security interest in the 2006 Dodge Ram. 16 *Del. C.* §

---

[5] The State's letter is dated December 21, 2012, which, based upon the Motion for Return of Property filed by Petitioner, would appear to be a typographical error.

-7-

47849(a)(4)d. Following the usual pre-trial discovery and motion practice, Petitioner's motion was ultimately scheduled for trial on July 28, 2016.

On September 16, 2014, Maddrey pled guilty in the New Castle County Superior Court to Drug Possession Tier III (cocaine), and was sentenced to four years at Level Five, suspended after two years, for probation at Level Three.[6]

## Applicable Legal Standard

The law regarding the State's ability to seize and forfeit private property is governed by Title 16 *Del. C.* § 4784, which states:

> (a) The following shall be subject to forfeiture to the State and no property rights shall exist in them:
>
> (1) All controlled substances which have been manufactured, distributed, possessed, dispensed or acquired in violation of this chapter;
>
> (2) All raw materials, products and equipment of any kind which are used, or intended for use, in manufacturing, compounding, processing, delivering, importing or exporting any controlled substance in violation of this chapter;
>
> (3) Any property which is used, or intended for use, as a container for property described in paragraph (1), (2) or (6) of this subsection;
>
> (4) Any conveyances, including aircraft, vehicles, or vessels which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, or possession with intent to deliver

---

[6] Cr. A. No. 1301021917

property described in paragraph (a)(1) or (2) of this section except that:

a. No vehicle used by any person as a common carrier in the transaction of business as a common carrier is subject to forfeiture under this section unless the owner or other person in charge of the vehicle is a consenting party or privy to a violation of the Controlled Substances Act;

b. No vehicle is subject to forfeiture under this section by reason of any act or omission established by the owner thereof to have been committed or omitted without the owner's knowledge or consent;

c. A vehicle is not subject to forfeiture for a violation of § 4761(a) or (b), § 4763 or § 4764 of this title; and

d. A forfeiture of a vehicle encumbered by a bona fide security interest is subject to the interest of the secured party if the party neither had knowledge of nor consented to the act or omission.

Under Delaware law, the State must first prove that "probable cause" exists for the belief that a vehicle was used to facilitate the sale, delivery or transportation of an illegal substance before it can be forfeited.[7] "The probable cause standard for forfeiture is essentially the same at that applied in Fourth Amendment search and seizure cases."[8] Thus, the State is required to prove more than mere suspicion, but

---

[7] *See In the Matter of One 1985 Mercedes Benz Automobile*, 644 A.2d 423, 428 (Del. Super. 1992).

[8] *In the Matter of One 1987 Toyota, DE REG 461262 VIN # JT2AE8659HO256431*, 621 A.2d 796, 799 (Del. Super. 1992).

less than *prima facie* proof before an item is subject to civil forfeiture.[9] If the State is able to establish probable cause to support the seizure of the vehicle or property in question, the burden then shifts to the petitioner to prove by a preponderance of the evidence that the property is not subject to forfeiture.[10] In this case, Petitioner, through her pleadings and testimony at trial, has argued that the Dodge Ram is exempt from seizure because she had no actual knowledge that it was being used to transport or facilitate the sale of illegal drugs. This argument, pursuant to section 4784(a)(4)(b), is commonly referred to as the "innocent owner defense."

### Facts Adduced at Trial

At trial, the State called three witnesses to establish the factual background for the investigation, as previously outlined, and to establish probable cause to seize the Dodge Ram. The witnesses, all officers with the Delaware State Police, were Det. Dudzinski, Sgt. Diana and Cpl. Jubb. Petitioner testified on her own behalf as her only witness. In rebuttal, the State offered the testimony of David Smith of the Delaware Division of Revenue.

At trial, Det. Dudzinski testified that neither he, nor any of the other officers involved in the surveillance operation, ever observed Petitioner operating the Dodge Ram truck—it was always Maddrey. Det. Dudzinski also testified that

---

[9] *Id.*

[10] *See In re One 1984 Chevrolet Blazer: Doris Pettyjohn*, 2000 WL 1211235, \*2 (Del. Super., June 30, 2000).

based on his training and experience as a drug investigator, it is common for people engaged in the drug trade to put property, such as vehicles, in the name of third parties to help insulate themselves from police scrutiny and prosecution. However, on cross-examination, Det. Dudzinski did concede that he had no direct evidence that the purchase of the Dodge Ram by Petitioner was a "straw purchase" for Maddrey. Det. Dudzinski also testified that Petitioner did not appear to be involved in Maddrey and Saunders' illegal drug operation in any way and that no drugs were ever found in the Dodge Ram itself.

Sgt. Diana testified that he became involved in the investigation starting in September of 2012. He testified that he observed Maddrey operating the Dodge Ram on at least five different occasions, including driving it to his work, parked in front of his home and work, and when arriving to participate in drug transactions with Saunders. Sgt. Diana also testified that he never observed Petitioner to have had any contact with the Dodge Ram.

Cpl. Jubb testified that he was asked to conduct a search of the interior of the Dodge Ram prior to the trial, which he did on May 13, 2016. The Dodge Ram had been stored in a secure police lot at DSP Troop 2 since it was seized. Within the Dodge Ram, Cpl. Jubb located over 40 different documents, all in the name of, or pertaining to, Stanely Maddrey and his home address. The documents were located either on the passenger side floor or the glove compartment storage box.

-11-

The documents ranged in date from 2009 up until October of 2012. The documents included various bills, letters, pay stubs, medical documents, tax documents and receipts. In short, the documents Cpl. Jubb located were all of the type and variety one would reasonably expect to find stored in a person's home desk or office. Notably, none of the documents found pertained to Petitioner. Cpl. Jubb created an itemized list of the documents which were all then entered as evidence as a single exhibit.[11] No vehicle registration or insurance card was found in the Dodge Ram. Cpl. Jubb also testified that he located "bright yellow/green construction-type clothing" in the backseat of the Dodge Ram. On cross-examination, Cpl Jubb testified that this clothing was consistent with the type of clothing Maddrey might have worn as a dump-truck driver at his place of employment, Contractor's Hauling, LLC.

Petitioner testified on direct examination that she has known Maddrey since about 1978 or 1979, when he was about five years-old. She testified that their relationship was akin to that of a big sister and little brother. Initially, she testified that she was unaware of Maddrey's past criminal convictions. Petitioner testified that she had moved out of the area for a period of time, returning in 1987. Petitioner then testified that she was aware that Maddrey had been in some legal

---

[11] State's Exhibit 6.

trouble, "attempted murder or something like that." Petitioner then testified that she knew Maddrey went to prison "in 2003 or 5," but did not know why.

Petitioner testified that she purchased the Dodge Ram in 2008 from "Carmen" (presumably the car dealership) on Route 13, for her boyfriend Craig Malone, "because his credit was bad." She testified that he used the truck to haul heavy car parts like transmissions and motors. Petitioner testified that at the time she purchased the Dodge Ram she was working as a receptionist at Halo, a hair salon. She testified that she had received a lump-sum of money from a lawsuit and that she used it to pay off bills and used about five or seven thousand dollars of it as a down-payment on the Dodge Ram.

Next, Petitioner entered into evidence a 2012 Social Security Benefit Statement showing that she was directly paid a total of $14,485 in benefits.[12] Petitioner also entered into evidence two DEXTSA Federal Credit Union Statements.[13] One statement was for the period of 08/01/12 to 08/31/12, and the second for the period of 12/01/12 to 12/31/12. The December statement shows that Petitioner was making monthly payments of $258.30 on a 2006 Dodge Ram, with a loan balance of $4,631.85. The statements also show that the only account

---

[12] Petitioner's Exhibit 1.

[13] Petitioner's Exhibit 2.

activity was the loan payments—the account does not appear to have been used for any other purpose.

Petitioner testified that she began receiving social security benefits in 2005, and that she presently receives between $1,200 and $1,300 per month. Petitioner testified that at some point after the Dodge Ram was seized by police, she paid the loan off in full. She also testified that she paid the auto insurance on the Dodge Ram and that it was in her name.

Petitioner testified that at some point after buying the Dodge Ram, her relationship with her boyfriend, Craig Malone, soured and they broke up. She said that they tried to get back together, but it did not work out. Petitioner also testified that during this time she also owned and was the primary driver for a 2002 Honda Accord.

Petitioner then testified that she loaned the Dodge Ram to Maddrey so he could use it "to get back and forth to work, he had no way to get to work." Petitioner testified that at the time she loaned the truck to Maddrey she had no idea he was involved in any illegal conduct. Curiously, Petitioner's counsel then asked her if she "personally ever made it clear that [the Dodge Ram] was for work only?" To which Petitioner responded, "yes, yes I did."

On cross-examination, Petitioner stated that she has known Maddrey for more than 45 years and that they are friends. Petitioner again confirmed that she purchased the Dodge Ram in 2008 for her boyfriend. Petitioner was asked about her lawsuit and resulting settlement, a portion of which she claimed to have used to purchase the Dodge Ram. Petitioner testified that the settlement was in 2005 or 2007, but refused to say how much it was for; all she would say is that it was "personal." Petitioner also testified that in 2005 she knew that Maddrey again went back to prison. However, she denied knowing why.

The State then questioned Petitioner about her work history. Petitioner stated that she has worked "on and off" and that she went back to work in 2009 or 2010 thru some type of "program." She testified that she worked at Halo for about a year, left, and then returned about three years ago. Petitioner was asked if she had reported her income and paid taxes, to which she responded, "yeah." Petitioner was then asked if she paid her Delaware taxes, to which she replied "no." Petitioner explained that in the "program" she was in, she did not have to report her income or pay any taxes—up to a certain amount. Petitioner stated that she might work 3 days a week and bring home $200 a week, but how much she worked "depended on how she felt."

Petitioner testified that her monthly living expenses, excluding food, in 2012 totaled about $853. Petitioner testified that she was living with 3 or 4 other people, but did not have to buy any food. Petitioner testified that she purchased the 2002 Honda Accord in 2005, paying nearly the full purchase price of $7,000 with a credit card. Petitioner testified that she had received money from a second personal injury accident settlement sometime in 2012. However, once again, Petitioner refused to disclose the amount of the settlement.[14]

Next, the State moved two sets of documents into evidence. The first was a certified copy of all title and sales documents maintained by the Delaware Motor Vehicle Division as to the 2006 Dodge Ram truck, VIN # 1D7HU18276S618728—Petitioner's truck.[15] The second was an identical set of documents as to a 2002 Honda Accord, also owned by Petitioner.[16] Petitioner confirmed that it was her signature on the documents in question and that the date of sale for the Dodge Truck was actually April 27, 2011. Petitioner was asked why she testified that she had purchased the Dodge in 2008, to which she replied "I thought it was 2008." Petitioner also confirmed that she made a down-payment of

---

[14] Considering this was a bench trial I did not force Petitioner to disclose the amount under threat of civil contempt. I did not feel it would have been proper to potentially hold Petitioner in civil contempt while at the same time acting as fact-finder. However, I do draw a negative inference from her refusal to answer the question as it impacts her credibility and was an obvious attempt to stymie the State's inquiry as to her financial resources.

[15] State's Exhibit 7.

[16] State's Exhibit 8.

$7,000 on that same date. Petitioner was then asked when she bought the Honda Accord, to which she stated: "In 2005, didn't I? You have the paper." Petitioner was then confronted with the bill of sale for the 2002 Honda Accord which showed that the purchase date was actually February 27, 2009.

Finally, as to this line of questioning at least, Petitioner was asked if "she had another vehicle in her name, a 2005 Acura?" Petitioner replied that she did, however, she quickly added that it "just got totaled." Petitioner was asked how much she paid for the Acura, to which she replied that "it was a gift." Petitioner was asked who gave her the Acura, however, again, she refused to answer.

Next, the State moved on to the subject of taxes. Petitioner was asked when she last filed her taxes. Rather flippantly, she replied "I'll have to call my accountant because I'm not sure. I think it was 2005 I believe." Previously, Petitioner had testified that she had not filed her taxes for only the last 3 years. Petitioner explained that she had not filed "because they automatically take it out of your social security money."

Petitioner was asked if she knew how many vehicles Maddrey owned back in 2012 or 2011, to which she replied, "I believe four." Petitioner then testified that she permitted Maddrey to use the Dodge Ram shortly after she had purchased it, "November, October, something like that; whenever he got the job it was soon after." Petitioner, despite denying knowledge of Maddrey's illegal activities, then

testified that she had "a conversation [with Maddrey] and I did say that I didn't want any illegal activities going on. I have tried to change my life." Petitioner admitted that this conversation occurred sometime after she gave Maddrey the keys to the Dodge Ram, but before it was seized. Petitioner further explained that Maddrey needed the truck because "all of his kids were away at college and were using his other vehicles." Petitioner testified that Maddrey has six children and that she is "good friends" with his wife. Later, on re-direct, Petitioner explained that in allowing Maddrey to use the Dodge Ram she advised him that "... I really don't want you to do anything that wouldn't be lawful." On re-cross examination, Petitioner agreed that she had some suspicions that Maddrey was capable of getting into trouble and replied that "everyone's capable of doing it."

Returning, once again, to the subject of Maddrey's prior incarceration, Petitioner testified that she was aware that Maddrey went to jail back in 2005 and believed that he served three years. She did not know if it was for a felony or a misdemeanor, but believed in "second chances" so she did not think much of it or inquire further. Petitioner testified that she still lives in the same house where she lived as a child and that she never received a "huge windfall" from any of her lawsuits.

Finally, in what can only be viewed as an admirable effort at post hoc damage control by her counsel, Petitioner testified in response to her counsel's leading questioning that she did not want to disclose the amount of money she received from her lawsuits because one of them involved the death of a person she loved and it was too painful to discuss. It was apparent to me that Petitioner's counsel clearly sensed how incredulous she appeared by refusing to answer the State's questions concerning the lawsuits. Counsel's use of a leading question to supply Petitioner with the desired answer was a skilled moved; however, the overall effect was unconvincing.

As the final witness, the State called David Smith from the Delaware Division of Revenue. Smith testified that he has worked for the Division of Revenue for 29 years. Smith testified that a search of the Divisions' records indicated that Petitioner last filed her Delaware State income taxes in 1998.

### Analysis

At the outset, I find that the State has easily established probable cause to seize the 2006 Dodge Ram. The testimony presented by the State unequivocally established that Maddrey and Saunders were both deeply involved in illegal drug trafficking and that the Dodge Ram, owned by Petitioner, was used by Maddrey on numerous occasions to make deliveries of large amounts of cocaine. In fact, the Dodge Ram appears to have been Maddrey's sole and exclusive method of

-19-

transportation throughout the course of the investigation. The considerable amount of USC, firearms and cocaine found by police only confirmed their observation of Maddrey's illegal activities over the preceding months. Finally, the fact that Maddrey later pled guilty to cocaine possession and agreed to forfeit the money seized from his residence pushes the evidence to the point of overwhelming. Additionally, I find all of the State's witnesses to be entirely credible; Petitioner, for the reasons that follow, far less so.

Petitioner's argument that she had no knowledge of Maddrey's illegal activities is belied by her own statements and the other circumstantial evidence present. I find Petitioner's credibility to be severely, and conveniently, lacking. Petitioner initially testified that she was unaware of Maddrey's criminal history, but then repeatedly contradicted herself over the course of the trial. Ultimately, Petitioner testified that she knew Maddrey had finished serving three years in jail. Most tellingly, Petitioner felt the need to warn Maddrey not to engage in any illegal activities while he used her vehicle. The facts clearly indicate that although Petitioner was not involved in Maddrey's illegal drug operation, she was aware of his criminal past and knew he was capable of further criminal conduct.

Petitioner's testimony that she purchased the Dodge Ram in 2008 for her boyfriend Craig Malone, appears to be a story invented out of whole cloth. DMV records establish that the Dodge Ram was purchased by Petitioner on April 27,

2011. Notably, Petitioner did not call Craig Malone as a witness to corroborate what is arguably the most critical aspect of her testimony. Additionally, Petitioner testified that she allowed Maddrey to use the truck starting sometime around November of 2011. Thus, if Petitioner is to be believed, she loaned the truck to Maddrey just a little over six months after purchasing it for her boyfriend who, according to her, needed it for his business. However, if Petitioner's alternate explanation is to be believed, she purchased the truck and then allowed Maddrey to use it because his kids were using his four other vehicles at college. Apparently, Petitioner would have me ignore the fact that she purchased the truck despite her very limited income and already owning two other cars at that same time—the 2002 Honda Accord and the Acura that was "gifted" to her.

Petitioner's credibility is further tarnished, in my view, by her refusal to disclose the amount of money she received from her two lawsuits. Petitioner's explanation that the money aspect of the settlements was "too painful" to discuss due to the death of a loved one is just far too convenient. Petitioner clearly had no problem overcoming her grief so she could spend the money. The more likely explanation, in my view, is that Petitioner did not want to disclose the exact amount because it would have evidenced where she did—or more likely did not—get the money she used to make the large down-payments on the Dodge Ram and the Honda. Over the course of her testimony, Petitioner clearly became aware that

the State was adding up her monthly expenses and comparing it to her monthly income. Not including any income from Halo that Petitioner *may* have earned in 2012, Petitioner had less than $82 per week in discretionary income in 2012—and that is assuming she never had to buy food or clothing.[17] Thus, a lawsuit settlement is certainly an easy way for her to explain the source of the cash she used to pay for her vehicles. Moreover, I note that Petitioner has offered no actual proof that she was ever a party to a lawsuit, much less any type of award.

Not once did the police ever observe anyone other than Maddrey operating the truck from September 2012, until November 2012. The over 40 documents found in the truck by police clearly indicate that Maddrey was using the truck for an extended period of time and using it as his personal office while he was in possession of it. Further supporting my conclusion is the fact that Maddrey knew any vehicle he owned that was used in connection with his illegal drug activity could be forfeited to the State—it had happened to him before. As part of his 2005 Racketeering conviction, Maddrey forfeited a 1997 Dodge Dakota pickup truck.[18] The similarity in the type of vehicles is striking.

Because Petitioner offered little documentary evidence to support her testimony, her credibility becomes paramount. To this point, Petitioner's work and

---

[17] $14,485 - $10,236 ($853x12)/52 weeks = $81.71.

[18] State's Exhibit 1, page 5.

tax filing history further hurts her case. Petitioner's testimony that she last filed her taxes in 2005 is clearly wrong; it was 1998—a significant difference. Additionally, Petitioner's excuse as to why she had not filed her taxes, namely that "they take it out automatically," was also far too convenient to be credible. Petitioner is 60 years old, and therefore has been responsible for filing her taxes for the last 42 years, or at least she did up until 1998. Finally, Petitioner's response to the State that she would have to "ask her accountant" came across as flip, argumentative and incredulous. Considering that Petitioner has not filed her taxes since 1998, it stands to reason that she does not have an accountant at all.

## Conclusion

In a return of property trial the burden is on the petitioner to rebut the presumption of forfeiture once established by the State. In this case, Petitioner has offered little to corroborate her contradictory and dubious testimony. It is important to note that the State is not required to prove that Petitioner had "actual knowledge" of Maddrey's illegal activities when she gave him the truck to use. Delaware courts have rejected such a strict construction of the forfeiture statute, holding that the question is did the owner have any "reason to know-of the

improper use of the vehicle."[19]  This standard is also referred to as "guilty knowledge." [20]

Based upon the direct and circumstantial evidence presented, I am firmly convinced that the purchase of the truck was a "straw purchase" for Maddrey. Petitioner clearly abandoned her interest in the truck soon after purchasing it by allowing Maddrey sole and unfettered use of it to facilitate his illegal drug dealing activities.  The DEXSTA account in Petitioner's name was used solely to make payments for the truck; a fact I find to be highly unusual as common sense dictates that most people make automatic payments from the account their income is deposited into monthly—usually their primary checking or savings account.  The DEXSTA account shows one deposit in August in the amount of $500 from a credit card, and no deposits in December.

The fact that Maddrey drove the truck to his place of employment, frankly, appears incidental to his real source of income—drug dealing.  Petitioner clearly turned a blind eye to Maddrey's actions with the truck in light of her admitted knowledge of his criminal past.  Petitioner's need to testify to the fact that she "warned" Maddrey not to do anything "illegal," with the truck has no other logical explanation.

---

[19] *Hack v. State*, 2009 WL 3636764, *4 (Del. Super., November 3, 2009) (ordering forfeiture of vehicle because owner "impliedly knew" it would be used to transport illegal drugs).

[20] *Id.*

Petitioner has not met her burden to prove by a preponderance of the evidence that the 2006 Dodge Ram is not subject to forfeiture. In fact, when viewed in total, taking into account all logical inferences, I find that the weight of the evidence indicates that more likely than not, Petitioner purchased the truck at Maddrey's behest so he could avoid the danger of another forfeiture and then she abandoned her possession of it shortly thereafter. For this reason, I recommend that the 2006 Dodge Ram be forfeited to the State of Delaware pursuant to 16 *Del C.* § 4784(a)(4)(b).

**IT IS SO RECOMMENDED.**

BRADLEY V. MANNING,
Commissioner

Original to Prothonotary
cc:   Petitioner
      All counsel via e-mail.